1                     UNITED STATES OF AMERICA
                 EASTERN DISTRICT OF MISSOURI
2                       EASTERN DIVISION

3 UNITED STATES OF AMERICA,     )
                          )
4          Plaintiff,      )
                          )
5     vs.              )  No. 4:14-CR-88 RWS
                          )
6 DIONNE LAMONT GATLING,      )
                          )
7          Defendant.      )

8

9                TRANSCRIPT OF MOTION HEARING

10        BEFORE THE HONORABLE SHIRLEY P. MENSAH
11          UNITED STATES MAGISTRATE JUDGE

12                October 25, 2017

13
   APPEARANCES:
14
   For Plaintiff:     Mr. Dean R. Hoag
15                  OFFICE OF U.S. ATTORNEY
                 111 S. 10th Street
16                  20th Floor
                 St. Louis, MO  63102
17

18    For Defendant:     Ms. JoAnn Trog
                 MENEES AND WHITNEY
19                  121 W. Adams
                 Kirkwood, MO  63122
20

21    REPORTED BY:       SUSAN R. MORAN, RMR, FCRR
                 Official Court Reporter
22                  111 South 10th Street
                 St. Louis, MO  63102
23                  (314) 244-7983

24

25 Proceedings recorded by mechanical stenography, produced by
computer-aided transcription.

1          (The following proceedings were held in open court

2     on October 25, 2017 at 9:58 a.m.:)

3          THE COURT:  We're on the record -- you can stay

4     seated.  I don't think we need Mr. Gatling.  We're on the

5     record in United States versus Dionne Gatling, the case

6     number is 4:14-CV-88 RWS.

7          We're here on Mr. Gatling's motion to reconsider

8     detention.  Counsel, please announce your presence for the

9     record.

10         MR. HOAG:  Dean Hoag for the government.

11         MS. TROG:  JoAnn Trog for Mr. Gatling, who is

12    present and seated at counsel table, Your Honor.

13         THE COURT:  Good morning.  All right.  So we're here

14    on a motion filed by Ms. Trog on behalf of Mr. Gatling for

15    reconsideration of detention.

16         Ms. Trog, as I understand it, Mr. Gatling has raised

17    two grounds for pretrial release, the first being under the

18    Bail Reform Act.  And the position as I understand it is new

19    facts that have come to light since my initial detention

20    order, including facts related to Mr. Gatling's health and

21    facts related to evidence disclosed by the government and

22    some of which was presented at the *Franks* hearing in this

23    case are material to the factors that I have -- that I would

24    apply under the Bail Reform Act.

25         MS. TROG:  That is correct, Your Honor.

1             THE COURT:  And the other is as a due process

2     challenge.  Is that correct?

3             MS. TROG:  That is correct, Your Honor.

4             THE COURT:  Okay.  So what I'd like to do this

5     morning, and I have read the submissions from both parties,

6     and I have a good understanding, I think, of what your

7     respective positions are, but I do want you to address this

8     morning the specific facts that you think under the Bail

9     Reform Act would justify pretrial release.  What are they,

10    why they are new, and why they warrant a release.

11            And then on due process based on my reading of the

12    parties' written submissions, and Mr. Hoag has heard this

13    spiel before because Mr. Rush raised a similar argument,

14    first there doesn't appear to be any dispute that the factors

15    that in cases like *United States v. Briggs* and *United States*

16    *v. Hare,* which are cited in my September 14, 2017 order, I

17    think that might have been in relation to Mr. Rush's motion,

18    but those factors I believe govern the due process issue.

19            And I just want to make sure -- and so we're all on

20    the same page, the factors that I believe I need to consider

21    in evaluating the due process challenge are:  One, the

22    nonspeculative length of confinement -- of expected

23    confinement, the extent to which the government bears

24    responsibility for delay, the gravity of the charges and the

25    strength of the evidence justifying detention.  And that

1    would include the existence of any rebuttal presumption for

2    detention.

3            My reading of the cases is that although no one

4    factor is dispositive, the way that the cases seem to apply

5    those factors is that the longer the length of detention, the

6    more weighty the other concerns have to be.  And where

7    pretrial detention is very long, and some courts have put

8    that in the two years and more, then continued detention is

9    justified only if the government is not responsible for any

10   significant portion of the delay and special circumstances

11   indicate that the defendant's release would pose an

12   extraordinary threat to the government's regulatory interest

13   in pretrial detention.

14           And I'm saying all of this and outlining these

15   factors to make sure that we're all on the same page.  And I

16   found no Eighth Circuit cases that require a different

17   standard than what I've outlined for the parties.  And so the

18   first thing I want you to do with respect to the due process

19   part of the argument is to alert me if either side is aware

20   of any Eighth Circuit cases that would require me to apply a

21   different standard than what I believe the standard to be

22   based on my reading of the case law.

23           The second thing I want you to do for me with

24   respect to the due process challenge is to discuss the

25   presence or absence of these factors, assuming these are the

1    right factors, under the facts of this case with respect to

2    Mr. Gatling.  So that's why I wanted to have the hearing.

3    And if there are other issues, arguments that you believe are

4    pertinent to either of these bases raised by Mr. Gatling,

5    certainly I'm happy to hear that as well.

6              MS. TROG:  If I may, Your Honor.

7              THE COURT:  Yes.

8              MS. TROG:  First, I would certainly concur with your

9    assessment that there are no Eighth Circuit cases which

10   specifically address the situation that is before the Court

11   right now.  I think counsel is relying on cases from other

12   circuits, the District of Columbia.  And we certainly do not

13   disagree with the assessment of the three factors under

14   *Briggs* that must be addressed.

15             It is our position -- oh, excuse me, Your Honor.  So

16   we believe that the Court has correctly, Your Honor has

17   correctly assessed the three criteria regarding Mr. Gatling's

18   confinement, concerning his length of confinement, the

19   government's responsibility for the delay, and the strength

20   of the -- and the strength of the evidence justifying

21   continued detention.

22             To put this case in perspective, Your Honor,

23   Mr. Gatling has been in custody since March of 2014.  That is

24   43 months, 43 months of a depravation of his liberty that

25   pretrial detention entails.  In all of our searching, Your

1    Honor, as well as looking in the *Ali* case and the *Briggs*

2    case, the length, the longest length of time that we could

3    find is detention in the amount of 33 months.  We have now

4    exceeded 33 months by ten months.  And quite frankly we do

5    not know when the trial of this case will be had.  It might

6    be in 2018, but we have no guarantee.  As the Court is aware,

7    we had nine days of *Franks* hearing and it encompassed a

8    tremendous volume of testimony.

9         So we believe that one of the first prongs that must

10   be looked at is simply the length of time that Mr. Gatling

11   has already been confined, and down the road how much longer

12   he may be confined.

13        The second prong, Your Honor, is the government's

14   responsibility for the delay.  Now, I'm not accusing the

15   United States Attorney for the Eastern District of the delay,

16   but I think we can all agree that there was a significant

17   delay in the government providing discovery regarding the

18   ongoing investigation with regards to Agents Cromer, Swoope,

19   Aguilar and various and myriad other people who were

20   subpoenaed to testify under oath in both the OIG and the OPR

21   investigation.  They knew --

22        (Cell phone rang.)

23        MS. TROG:  Oh, my gosh, I'm sorry, Your Honor.  I'm

24   so sorry.

25        THE COURT:  That's okay.

1           MS. TROG:  The government knew in the spring of 2015

2     that they had a problem.  And they went through an enormous

3     amount of, as I said, depositions, sworn testimony.  But we

4     only got it in dibs and drabs.  And this just added to it.

5     If we recall back in the spring of 2016, we were trying to

6     figure out dates for the *Franks* hearing.  Well, every date we

7     chose had to be set back because there was receipt of

8     additional testimony, additional discovery.  Even, Your

9     Honor, you'll recall during the nine days of the *Franks*

10    hearing there was significant discovery that the government

11    here received and that -- in a couple instances we were just

12    provided the morning before the hearing.

13          So I do believe that the government bears some

14    responsibility.  And I'm talking the government as a whole,

15    Your Honor.  That the government bears a fair amount of

16    responsibility for the delay.

17          Now, the third prong is perhaps the most important,

18    Your Honor, and that is the strength of the evidence

19    justifying detention.  In *Briggs* the Court recognized that

20    the longer the detention, the longer the prosecution's part

21    in prolonging it, the stronger the evidence justifying

22    detention must be.  So the longer that Mr. Gatling is in

23    custody, the more compelling the evidence must be.  And that

24    I would submit to you, Your Honor, was disclosed or their

25    lack of evidence in the confines of the nine days of *Franks*

1    hearing.

2          The government's case we believe, Your Honor, is

3    predicated on the Title III affidavit, which of course was

4    the subject of the *Franks* hearing.  The cornerstone of that

5    affidavit was CS1.  And CS1 testified, Your Honor, with

6    regards to various matters, some of which were in open court

7    and some of which were at a sidebar.

8          But I think to be general, Your Honor, that the

9    credibility of CS1 or her lack of credibility became very

10   paramount in the defendant's case.

11         CS1 is actually the defendant's biggest asset.

12   Defendant -- excuse me, CS1 in our opinion, Your Honor,

13   destroyed the affidavit.  She destroyed the affidavit because

14   of her own credibility -- again, or her lack of credibility.

15   She admitted to lying.  She admitted that she would lie at

16   the direction of the government agent.  She admitted that

17   Agent Cromer would feed her information so she could pass it

18   on to other agents.  She lied with regards to a three-way

19   phone call that took place on August the 5th that never took

20   place.

21         She lied that Cromer was in her residence, and that

22   simply was not true.  That was borne out by the testimony of

23   Agent Cromer who testified that he was in South Carolina with

24   his family.

25         She lied a lot.  She lied that she -- she lied, she

1  said, well -- although this wasn't so much a lie as an

2  omission.  "I knew I was getting paid, but I didn't know why

3  I was getting paid."  And it seemed not to bother her.

4       THE COURT:  I was going to ask you a question but

5  I'll let you finish.

6       MS. TROG:  Okay.  She also admitted very candidly

7  that the allegations in the affidavit were in fact lies and

8  she recanted them.  She also prepared her own affidavit at

9  one point where she recanted many of the allegations that

10 were contained in the affidavit.  She also admitted that she

11 and Agent Cromer were in an illicit sexual relationship.

12 This was borne out by Agent Cromer's testimony that he was

13 involved in an illicit relationship with her.

14      She admitted that she had no prior dealings with

15 drug dealers, drug personnel, yet this was a woman who

16 provided monthly stipends or provided money on various

17 inmates' commissary funds.

18      She portrayed herself as an innocent individual,

19 that she was just doing what other people were doing -- told

20 her to do.  And the reason that her credibility becomes so

21 important, Your Honor, especially with regards to

22 Mr. Gatling, is with regards to this area of threats, which

23 is set forth in the government's response.

24      She makes allegations about her safety.  She makes

25 allegations that she feared for her life.  She made all kinds

1    of allegations, Your Honor, but when you look at 360 degrees

2    of her, what do we have?  We have a woman who said she was

3    afraid but she had no hesitation going to a Bureau of Prisons

4    facility to visit Mr. Flenory.  She had no hesitation, Your

5    Honor, to lie.  She had no hesitation to establish one fact,

6    she was the most important person there was and nobody else

7    made any difference.  She lied in her bankruptcy.  She didn't

8    report income.

9         And the one thing I gathered from her testimony,

10   Your Honor, is that it's everybody else's fault.  If I'm in

11   this position, it's everybody else's fault.  It's

12   Mr. Gatling's fault.  It might be Mr. Flenory's fault.

13   Everyone except her.

14        Now, specifically she talked about some threats that

15   she believed that she received from the daughter of

16   Mr. Gatling, Tamara.  And I'm referring to a threat on

17   March the 16th of 2015.  As is noted in both our motion, the

18   government's response, Margaret Henderson is not an associate

19   of Mr. Gatling, but rather Margaret Henderson is the mother

20   of Tamara Gatling, and Margaret Henderson is in no way,

21   shape, or form connected with this matter, except her phone

22   was used by her daughter.

23        Now, one of the difficulties that was raised early

24   on, remember in the spring of 2015 her name came out

25   inadvertently.  And she talks about a phone --

1          MR. HOAG:  Should I be objecting if I feel like the

2     facts are wrong or should we just not -- I don't know what

3     you want me to do, okay, because I don't want to lengthen

4     this process, but I'll just sit down.

5          THE COURT:  I guess, Mr. Hoag, what I would like for

6     to you to do is if there is a factual dispute I want you to

7     point it out in your response to anything that Ms. Trog says.

8     You're not taking those kind of notes.

9          MR. HOAG:  I'm not taking those kind of notes,

10    Judge.

11         THE COURT:  But if there are big picture things you

12    want to highlight, just highlight them in your response, that

13    way she can -- and, Ms. Trog, you are -- you did start to tie

14    this back in to the justification for detention, but I want

15    us to keep focused on that, okay.

16         Just assume for the moment, for the purposes of this

17    hearing that I -- because these are issues that clearly I'm

18    going to have to decide in connection with the *Franks* issues,

19    which are now submitted to me.  Assume for the moment that I

20    agree with the defendants, whatever position, what your

21    position is going to be.  Tell me how those facts are

22    relevant to the factor on justification for continued

23    detention.  Because you are going to have to tie that back to

24    the initial reasons for detention, okay.  The initial reasons

25    for detention, and I think you're starting to get there when

1    you're talking about threats.  That's clearly a big issue.

2           I'll be perfectly candid with the parties.  That's a

3    big issue, particularly with respect to Mr. Gatling because

4    the government has raised that as an extraordinary reason

5    that justifies his continued detention under the due process

6    analysis.  So I want you to focus on that.

7           And let's not lose site of the fact that there was a

8    detention hearing, there were factors that were presented to

9    the Court, and I made a decision based on those factors.  So,

10   you know, you've got to tell me how do these new facts, the

11   things that came to light in the *Franks* hearing, how do they

12   impact that original decision --

13           MS. TROG:  Understood, Your Honor.

14           THE COURT:  -- one way or the other.

15           MS. TROG:  Understood, Your Honor.  What I was

16   finally getting to, perhaps too long of a prologue, was there

17   are two issues.  One is whether defendant represents a danger

18   to the community, and whether there is a risk of flight by

19   the defendant.  Those are the two basic matters I believe

20   which this Court must decide, certainly under the Bail Reform

21   Act and under due process, okay.

22           And so the ultimate burden falls on the government

23   to present clear and convincing evidence that the defendant

24   represents a danger to the community.  Clear and convincing

25   evidence, not preponderance.  Preponderance of the evidence

13

1    governs the issue of the risk of flight.  But rather the

2    focus should be, I believe, Your Honor, on this clear and

3    convincing evidence.

4          And so when the issues of the threats are raised by

5    CS1, one, she talks about a phone conversation, but nobody

6    heard the phone conversation, we just have her recitation of

7    it.  She talks about someone in Atlanta following her in a

8    black Nissan Maxima vehicle.  But there is no ties.  She

9    never saw it -- saw him before, she had no other contact.

10   There was no other difficulties with this.

11         And, Your Honor, we would posit that there is no

12   clear and convincing evidence other than the statements by

13   CS1, which we believe her credibility was destroyed during

14   the *Franks* hearing.

15         THE COURT:  Okay.

16         MS. TROG:  And the difficulty and the tenor of her

17   conversation was what suited her at the time.  So we believe,

18   one, that there is no clear and convincing evidence that

19   while this Court might have thought and as this Court said in

20   the early -- or in its order of 2016, short of a full-blown

21   *Franks* hearing, the undersigned cannot say whether the

22   alleged misconduct of the DEA agents involved in the

23   investigation of this case is material or otherwise has any

24   bearing on the issue of whether there are conditions of

25   release that will reasonably assure Gatling's appearance and

1     the safety of the community by a person in the community.

2              We believe that the evidence elicited does not rise

3     to the level, never has risen to the level that Mr. Gatling

4     poses a danger to the community in general or to CS1.  CS1

5     isn't going to be called as a witness.  The government has

6     admitted that.  They are not going to be -- they are not

7     going to call her.  So why in heavens would we want to do

8     anything with CS1?  Because we never did anything with her

9     initially and we're certainly not going to do anything with

10    regards to her now, Your Honor.

11             With regards to the other issue, the risk of flight,

12    Your Honor, we believe that we set forth sufficient

13    prophylactic measures in both our motion in 2016 and we

14    reiterated again, and I'm certainly not going to go through

15    in paragraph to paragraph here, Your Honor.  But if

16    Mr. Gatling is placed on home detention, the government can

17    certainly impose enough prophylactic measures where they will

18    know exactly what he's doing and when he's doing it.  I've

19    had too many clients, a couple now who are in home

20    incarceration, and the lady walked 500 feet out and there was

21    a phone call, and why had she went too far out on the

22    sidewalk.  So I believe that there are significant measures

23    that the government can take to assure Mr. Gatling's

24    appearance at any and all court proceedings.

25             His wife, we would even recommend that she be

1    appointed a third-party custodian if the Court had any fears

2    that Mr. Gatling in fact would not appear.

3            Mr. Gatling has been involved in this case since

4    2014.  And as his counsel, he is -- I can assure you the

5    multi -- many, many conversations that we have had, we want

6    to see this to a conclusion so that he can clear his name.

7            So, Your Honor, I believe that the *Franks* hearing

8    did away -- we believe should do away with this Court's

9    concern that there is no clear and convincing evidence.  And,

10   secondly, that there are enough prophylactic measures in

11   place that could assure Mr. Gatling's appearance.  And

12   therefore, Your Honor, we believe that under *Briggs,* under

13   *Ali*, and the cases that the government has read that because

14   this detention has gone so long that his rights under due

15   process have been abrogated and he is entitled to be under

16   home detention to better help his counsel.  And we just

17   believe, Your Honor, this is an abuse of the process to have

18   a continued detention.

19           THE COURT:  Thank you, Ms. Trog.

20           MR. HOAG:  First of all, I am not going to get into

21   a dispute with respect to the *Franks* hearing and the

22   credibility of the witnesses and whatever else it is.  That's

23   already been argued ad nauseam in our memorandums, and it is

24   what it is.

25           What I am going to talk about is you are talking

1    about due process and if it's a violation.  With the

2    exception of the length of his incarceration, which the

3    government does agree is a significant amount of, but the

4    factors that we're talking about on the seriousness of the

5    charges, nothing can be more serious than the elimination of

6    two witnesses, Mr. Morgan, and back in 2010, I can't remember

7    his name right now, but he was murdered outside a clinic.

8    And there's credible evidence, there's credible evidence that

9    a jury, grand jury would find probable cause to believe that

10   Mr. Gatling, okay, was involved in both of those.  And

11   nothing could be more critical or serious in a charge.

12           That really parlays into what CS1 had to go through.

13   She talks about lies.  I'm not going to argue about lies.

14   What I am going to say is none of the information that we're

15   talking about here, none of it, okay, was out there before

16   she was outed in March of 2015 by defense counsel for

17   Mr. Gatling.  Not inadvertently but deliberately he outed

18   her.  And all of her actions with respect to that have to do

19   with protecting herself and protecting her daughter.

20           And it wasn't just a single act of intimidation, she

21   was called on the phone, she was followed at her office, she

22   was threatened by his family.  He actually even got on social

23   media and dictated during the *Franks* hearing, and while she

24   was on the stand she received a message from somebody related

25   to the Gatling case.

1          It is a clear -- clearly it is a case of continued

2     intimidation.  That ties into whether or not he should be

3     released.  He orchestrated these things from prison.  While

4     he's sitting in prison he has people, okay, that were willing

5     and able, okay, to intimidate her or attempt to intimidate

6     her so that she would not testify at the *Franks* hearing.

7          The factor says, "The extent of which the

8     prosecution bears responsibility for the delay."  And by

9     prosecution I'm talking about "us," not "the government,"

10    because some of those things were out of our hands, that is,

11    the prosecution's hand.  She wants to lump "us" into "the

12    government," but OIG and OPR conducted their investigation.

13         We would have been remiss had we not provided them

14    with the extent to which the witnesses were cross-examined,

15    deposed.  There were over 30 depositions from OPR and I don't

16    know how many from OIG.  And certainly there were delays in

17    getting that.  But they wanted them.  They asked for them.

18    And in terms of delays with the witnesses during the Franks

19    hearing, okay, those were their witnesses.

20         If you recall, Agent Cromer testified, okay.

21    Ostensibly his lawyer said he was going to take the Fifth,

22    and remember, he didn't take the Fifth and he answered

23    questions.  And then everybody's surprise said, well, we need

24    to bring him back.  And not only did we bring him back once,

25    we brought him back again, all agreeable with the defense

18

 1    because they wanted to hear from Mr. Cromer.

 2              THE COURT:  Well, and I kind of raised this in the

 3    last hearing, Mr. Hoag.  It seems, I don't know, don't you

 4    think it seems a little byzantine to hold it against the

 5    defendants that they took advantage of disclosures that they

 6    were entitled to?  They were entitled to that information.

 7              MR. HOAG:  I'm not faulting them, I'm explaining --

 8              THE COURT:  But I'm going to have to put it in

 9    somebody's column, right, who caused the delay as to the

10    government versus --

11              MR. HOAG:  Who is the witness?

12              THE COURT:  -- the defendant.

13              MR. HOAG:  Who is the witness?  Whose witness was

14    it?

15              THE COURT:  Well, I don't know.

16              MR. HOAG:  Did I call them?  Did we call them?  No,

17    the defense called them, ergo I don't know how we could be

18    blamed for a delay in calling a witness when it's their

19    witness.  Had it been my witness and we had these delays,

20    well, then maybe you put that in my column, maybe you do,

21    maybe you don't.  But the long and the short of it is, their

22    witness, not my witness.

23              And the strength of the evidence, well, as far as

24    we're concerned, okay, with respect to the charges that we're

25    talking about, the evidence has not been touched.  There are

1    two separate incidents involving Mr. Gatling and those

2    defendants, the three defendants.  They are reverses that

3    took place in February of 2013, okay, February I believe the

4    7th and February the 18th were the two where there was

5    two kilograms of cocaine or two kilograms of heroin and

6    15 kilograms of cocaine on reverses that were orchestrated

7    through agents from Memphis that had nothing to do with our

8    agents in Atlanta, okay.  And the reverses, the evidence is

9    overwhelming.  There are phone contacts between the agents

10   and the defendant and other defendants.  There's

11   surveillance.  There's a car -- a truck that's ultimately

12   taken that was supposed to contain the two kilograms of

13   heroin.  There is the defendant -- not the defendant but

14   other defendants showing up at the Butler Hill address, okay,

15   where they were supposed to pick up the 15 kilograms.

16   Nothing in that, okay, has been diminished, no evidence

17   regardless of what the *Franks* hearing has has diminished that

18   evidence and the strength of the government's case.

19        I beg to differ with her with respect to what she

20   says about the *Franks* hearing, and obviously you've got the

21   memorandums and they are what they are.

22        So except for the length of time involved, part of

23   which I believe are the responsibility of the government

24   because we were trying to get discovery to them, but part of

25   which were caused by the delay by witnesses the defense

1       called in that case.

2               So I don't think any part of the due process issue,

3       okay, has changed since your last ruling with the exception

4       of the length of the delay.

5               THE COURT:  Thank you, Mr. Hoag.  Anything further,

6       Ms. Trog, on behalf of Mr. Gatling?

7               MS. TROG:  Just a brief reply, Your Honor, response.

8       Your Honor, I would question the government when Mr. Hoag had

9       mentioned about the strength of the government's case, which

10      includes two homicides.  Two people lost their lives.

11      Mr. Theodis Howard was murdered in 2010 and Terrance Morgan

12      was murdered in May of 2013.  We do not take these issues

13      lightly, however, it must be presented to the Court that

14      based on the discovery provided by the government, Mr. Howard

15      began cooperating with the government in July of 2004 and

16      gave several proffers which included testimony about -- to

17      about 40 people or about 40 people in an ongoing drug

18      conspiracy, and it also involved Jorge Trevino who was the

19      head of a Mexican cartel.

20              So to simply look that Mr. Gatling should be held

21      responsible for Mr. Howard's murder, there were a lot of

22      other people who might have had a grudge against Mr. Howard.

23              Mr. Gatling was never questioned by the Metropolitan

24      St. Louis Police Department about either murder, for example.

25      That's a fact.

1          And the reason that I talk about the proffer, and it

2     was a very lengthy proffer back in July of 2004, it was made

3     to a very, very well respected detective, Detective

4     Llewellyn, who was very, very specific.  And in that proffer

5     in 2004 it talked about all kinds of individuals, none of

6     which was Mr. Gatling.

7          It did involve Mr. Gatling's brother Deron, but it

8     had nothing to do with Mr. Gatling.  And we believe that

9     there's enough individuals who had a grudge against

10    Mr. Howard, because Mr. Gatling didn't have any grudge

11    against him.  He may not have liked the fact that he spoke

12    about his brother, but his brother passed in 2006 when he was

13    in a correctional facility because of an asthma attack.  So

14    four years after, I don't think so, Your Honor.

15         With regards to Mr. Morgan, who was -- who met his

16    demise in May of 2015, according to the government

17    Mr. Gatling mistakenly believed that he was cooperating.

18    Well, and they say further that this evidence was derived

19    from the Title III interceptions established in this case

20    which takes us back to the *Franks* hearing.  So, again, in

21    Mr. Morgan's instance, he was never questioned by City

22    homicide.  These homicides -- that I'm aware of.  These

23    homicides never came into play until after the spring of 2015

24    when there was some difficulties with the government's case.

25         With regards to the amount of time that has passed,

1    Your Honor, and the government's part, we have never said it

2    was Mr. Hoag's delay or the United States Attorney's Office

3    here.  In case law it doesn't separate government, there is

4    no definition of "the government."  The government is the

5    United States, all the federal agencies underneath.  So we're

6    not pointing an accusatory finger at this U.S. Attorney's

7    Office, but the government as a whole has caused this delay.

8         With regards to CS1 and the continued intimidation,

9    there was one fact that I would just like to bring to the

10   Court's attention.  That it will recall there was testimony

11   about her safety, her fear of safety.  And one of the safety

12   concerns was not Mr. Gatling, remember, Your Honor, it was

13   Agent Cromer, Cromer's attitude about her, his control over

14   her.  That had nothing to do with Mr. Gatling.  And as a

15   result she was kept in a Marriott for two or three weeks.

16   So, again, we have difficulties with that, Your Honor.

17        Finally, with regards to the reverse stings, that's

18   what they were.  It wasn't -- and we haven't even gotten to

19   pretrial motions regarding the actual matters relating to the

20   reverse stings.  But we must remember, Your Honor, that these

21   came out of phone conversations whose origin was in the

22   affidavit, whose affidavit was predicated on CS1.

23        So we believe, Your Honor, that the difficulties

24   with this whole case is predicated on an affidavit.  If they

25   wouldn't have had an affidavit, they wouldn't have gotten

1    these phone calls.  And if it falls, Your Honor, the whole

2    case falls.

3            That's why we believe that the strength of the case

4    as we stand before you here on October the 25th of 2017 has

5    not the strength that it had back in March of 2014,

6    March 2015, or when the superseding indictment was filed in

7    August of 2015.  We therefore believe, Your Honor, that

8    Mr. Gatling -- that we have provided a scenario in which

9    Mr. Gatling can be protected from himself and others by these

10   prophylactic measures, and we believe the government has not

11   borne its level of proof with regards to the danger to the

12   community.

13           Thank you, Judge.

14           THE COURT:  Thank you, Ms. Trog.  Anything further

15   on behalf of the government, Mr. Hoag?

16           MR. HOAG:  No, Your Honor.

17           THE COURT:  Okay.

18           MR. HOAG:  I'm not ready to get into the worm hole.

19           THE COURT:  I think the parties have done a good job

20   of outlining their respective positions, both today in oral

21   argument and in the written submissions.  I'm going to take

22   the motion under submission.

23           With respect to the Bail Reform Act issue, I'll be

24   entering an order.  On the due process challenge, though, I

25   am going to treat that as I would any other constitutional

1   issue raised in the case.  And assuming I reach the due

2   process issue, I'll issue a Report and Recommendation that

3   both sides will have an ability to file objections to.

4           MR. HOAG:  Thank you.

5           MS. TROG:  Thank you, Judge.

6           THE COURT:  Court is in recess.

7           (Court in recess at 10:38 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2            I, Susan R. Moran, Registered Merit Reporter, in

3    and for the United States District Court for the Eastern

4    District of Missouri, do hereby certify that I was present

5    at and reported in machine shorthand the proceedings in the

6    above-mentioned court; and that the foregoing transcript is

7    a true, correct, and complete transcript of my stenographic

8    notes.

9            I further certify that I am not attorney for, nor

10   employed by, nor related to any of the parties or attorneys

11   in this action, nor financially interested in the action.

12           I further certify that this transcript contains

13   pages 1 – 25 and that this reporter takes no responsibility

14   for missing or damaged pages of this transcript when same

15   transcript is copied by any party other than this reporter.

16           IN WITNESS WHEREOF, I have hereunto set my hand

17   at St. Louis, Missouri, this 2nd day of February, 2018.

18

19                         _____

20                         /s/ Susan R. Moran
                           Registered Merit Reporter

21

22

23

24

25