# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                                )
     Plaintiff,            )
                                )
     v.                    )
                                )  No. 4:14-CR-88 RWS
                                )
DIONNE GATLING,             )
                                )
     Defendant.            )

## WAIVER OF INDICTMENT AND PLEA HEARING

### BEFORE THE HONORABLE RODNEY W. SIPPEL
### UNITED STATES DISTRICT JUDGE

### FEBRUARY 12, 2019

APPEARANCES:

For Plaintiff:      Michael A Reilly, Esq.
                    OFFICE OF THE U.S. ATTORNEY
                    111 South 10th Street, 20th Floor
                    St. Louis, MO  63102

For Defendant:      JoAnn Trog, Esq.
                    MENEES AND WHITNEY
                    121 West Adams
                    Kirkwood, MO  63122

Reported By:        SHANNON L. WHITE, RMR, CRR, CSR, CCR
                    Official Court Reporter
                    United States District Court
                    111 South Tenth Street, Third Floor
                    St. Louis, MO  63102
                    (314) 244-7966

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

1      **(PROCEEDINGS STARTED AT 10:08 AM.)**

2      **(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT AND WITH**

3                      **THE DEFENDANT PRESENT:)**

4              THE COURT:  We are here this morning in the case

5      styled United States of America against Dionne Gatling, Cause

6      No. 4:14-CR-88.  Would counsel make their appearances, please?

7              MR. REILLY:  Judge, I'm Mike Reilly for the United

8      States.

9              MS. TROG:  JoAnn Trog for Mr. Gatling, who is present

10     to my left, Your Honor.

11             THE COURT:  Morning, sir.

12             THE DEFENDANT:  Good morning.

13             THE COURT:  Counsel, it's my understanding that Mr.

14     Gatling is present today for the purpose of consenting to the

15     filing of a superseding information and then pleading guilty

16     to the superseding information; is that correct?

17             MR. REILLY:  Yes, Judge.

18             MS. TROG:  That is correct, Your Honor.

19             THE COURT:  That's all being done in conjunction with

20     the filing of a guilty plea agreement; is that correct?

21             MS. TROG:  Yes, sir.

22             THE COURT:  So, Mr. Gatling, I'm sure you understand

23     I'm going to ask you a lot of questions today.  If at any time

24     I ask you a question and for whatever reason you're not sure

25     you understand what I'm asking you, will you promise me that

1  you'll tell me that?  And I will repeat or rephrase my

2  question until it is clear that you and I understand each

3  other.

4          THE DEFENDANT:  Yes.

5          THE COURT:  We're not in a hurry.  The purpose of

6  saying that is if, at any time, you feel you need to consult

7  with your attorney, will you promise me that you'll tell me

8  that?  And I'll take a break and give you whatever time you

9  need to consult with your attorney.

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Because your answers to my questions are

12  to be under oath, at this time the clerk of the court will

13  administer the oath to you, sir.

14              **(DEFENDANT SWORN BY THE CLERK.)**

15                       **EXAMINATION**

16  **BY THE COURT:**

17  Q    So you understand, sir, that you've now been sworn and

18  that your answers to my questions are subject to the penalties

19  of perjury if you do not answer truthfully?

20  A    Yes, sir.

21  Q    The first series of questions I'm going to ask you are to

22  establish that you're competent to make the decisions you're

23  making today.  How old are you?

24  A    Fifty years old.

25  Q    What's the highest level of education you've completed?

4

```
1    A    A GED.

2    Q    So you didn't have any trouble reading the plea

3    agreement?

4    A    No, sir.

5    Q    Do you have a doctor or physician you see on a regular

6    basis?

7              MS. TROG:  Well, Your Honor, if I may?

8              THE COURT:  Yeah.

9              MS. TROG:  He's been under medical with physicians in

10   St. Mary's and through the various facilities where he's been

11   detained, Your Honor.  So he's been under the care of

12   physicians, but he doesn't have one particular physician.

13   Q    (BY THE COURT) So have you been told by any health care

14   provider that you have a chronic or long-term illness?

15   A    Yes, sir.

16   Q    What would that be?

17   A    It's called sarcoidosis.

18   Q    Are you taking any prescription medication for that?

19   A    Yes, sir.

20   Q    What would that be?

21   A    It's called prednisone.

22   Q    Are you taking the prednisone as prescribed, that is, in

23   the correct dose, at the correct time of day?

24   A    It's twice.  I mean twice daily, sir.

25   Q    You're taking it as prescribed?
```

5

1    A    As prescribed, yes, sir.

2    Q    When you take it, does it affect your ability to think

3    clearly?

4    A    No, sir.

5    Q    Okay.  Any other medication you're taking?

6    A    I'm asthmatic.  I take a steroid and an albuterol

7    inhaler.

8    Q    As needed or on a regular basis?

9    A    On a regular basis.

10   Q    Okay.  And do those medications affect your ability to

11   think clearly?

12   A    No, sir.

13   Q    Any other medications beyond that?

14   A    No, sir.

15   Q    Any medication you're supposed to be taking but for some

16   reason you're not taking it?

17   A    No, sir.

18   Q    Are you under the care of a psychiatrist or a

19   psychologist?

20   A    No, sir.

21   Q    Have you ever been under the care of any type of mental

22   health care provider?

23   A    No, sir.

24   Q    Other than the medicine you've told us about, have you

25   taken any drugs or medicine or drunk any alcohol in the last

1  24 hours?

2  A    No, sir.

3  Q    Are you under the influence of drugs or alcohol as you

4  stand here right now?

5  A    No, sir.

6  Q    Do you understand what's happening today and why you're

7  here?

8  A    Yes, sir.

9       THE COURT:  Does the attorney for the United States

10 Attorney's Office or the attorney for Mr. Gatling have any

11 doubt as to his competency?

12      MR. REILLY:  No, Your Honor.

13      MS. TROG:  No, Your Honor.

14      THE COURT:  It is my finding that Mr. Gatling is

15 competent to proceed.

16 Q    (BY THE COURT) I'm going to ask you some questions now,

17 sir, about your right to be indicted but your decision to

18 consenting to the filing of an information.

19      You understand you have a constitutional right to be

20 charged by an indictment of a grand jury, but you may waive

21 that right and consent to being charged by an information,

22 which is filed by the United States Attorney?

23 A    Yes.

24 Q    You're aware that instead of a grand jury indictment, the

25 felony charges in this case will be brought against you by the

1    United States Attorney by the filing of an information?

2    A    Yes.

3    Q    You understand if you do not waive indictment, you may

4    not be charged with a felony unless a grand jury finds that

5    there is probable cause to believe that a crime has been

6    committed and that you committed it?

7    A    Yes.

8    Q    You're aware that if you do not waive indictment by the

9    grand jury, the United States Attorney may request the grand

10   jury to indict you?

11   A    Yes.

12   Q    You're aware the grand jury is composed of at least 16

13   but not more than 23 persons, and at least 12 grand jurors

14   must find that there is probable cause to believe that you

15   committed the crime with which you're charged before you may

16   be indicted?

17   A    Yes, sir.

18   Q    You understand if you waive indictment by the grand jury,

19   the case will proceed against you on the information just as

20   though you had been indicted by the grand jury?

21   A    Yes, sir.

22         THE COURT:  And I have in front of me a written

23   waiver.  Counsel, do you know of any reason why Mr. Gatling

24   shouldn't waive his right to be indicted?

25         MS. TROG:  No, I do not, Your Honor.

8

1  Q  (BY THE COURT) And you've discussed the waiver issue with

2  your attorney.  Is that correct, Mr. Gatling?

3  A   Yes, sir.

4  Q   And you believe you understand your right to be indicted

5  by the grand jury; is that correct?

6  A   That's correct.

7  Q   And did you read this document before you signed it?

8  A   Yes, sir.

9  Q   And you went over it with your attorney?

10  A   Yes, sir.

11  Q   And she answered all your questions?

12  A   Yes, sir.

13  Q   Is that your signature on the top line, sir?

14  A   Yes, sir.

15  Q   Is it your desire to waive indictment by the grand jury

16  and have me execute this and consent to the filing of an

17  information?

18  A   Yes, sir.

19      THE COURT:  It is my finding that the waiver of

20  indictment is knowingly and voluntarily made by Mr. Gatling,

21  and I will execute the waiver.

22      And, Mr. Reilly, would you now explain to Mr. Gatling

23  the charges pending against him by the filing of an

24  information.

25      MR. REILLY:  Yes, Your Honor.  And just to supplement

9

1    the record and explain the charges in the information, the

2    information, the third -- what we'll refer to as the third

3    superseding criminal investigation in this case, operates to

4    Mr. Gatling's benefit.  This is what allows him to plead

5    guilty in a way in which he's not facing a mandatory life

6    sentence were he to plead guilty as this was previously

7    charged or be convicted at trial.  It's what allows for the

8    disposition in this case and the parties to make the

9    recommendation that we're going to make to the Court, and the

10   plea agreement has been agreed to by the parties.

11          So specifically under the first superseding

12   indictment, the defendant was charged in Count 6 with a

13   violation of 15 -- 18, United States Code, Section

14   1513(a)(1)(B) and Section 2 in relation to the murder of

15   Theodis Howard as retaliation for his previous cooperation.

16          The defendant was also charged in Count 9 of the

17   first superseding indictment, with violation of Title 18,

18   United States Code, Section 1512(a)(1)(C), in relation to the

19   murder of Terrance Morgan to prevent him from communicating

20   with federal investigators or federal law enforcement

21   authorities.  Both of those were punishable by mandatory life.

22          The effect of this criminal information is to --

23   among other things, is to allow the defendant to plead guilty

24   to a single violation of 18, United States Code, Section

25   924(j) in which both the murders of Theodis Howard and

10

1   Terrance Morgan are referenced in that single violation of 18,

2   United States Code, Section 924(j), which carries with it a

3   mandatory penalty of ten years, minimum of ten years, not more

4   than life, consecutive to all the other counts in the

5   indictment.  So the effect of this superseding information,

6   which I'll now go through, is substantially to Mr. Gatling's

7   benefit.

8        Count 1 charges that the defendant did combine,

9   conspire, and confederate with other persons known and

10  unknown -- they're listed in the indictment -- within the

11  Eastern District of Missouri, between 2009 and 2015, to commit

12  an offense against the United States.  That's to distribute

13  and possess with the intent to distribute cocaine, a Count

14  2 -- I'm sorry -- a Schedule II controlled substance.  It also

15  alleges a quantity allegation that was 5 kilograms or more.

16  That's Count 1.  That was previously -- I'll go through them,

17  reference how this correlates to the previous indictment.

18  That was previously Count 2 of the old indictment.

19       Count 2 of the superseding information, criminal

20  information, alleges a heroin distribution conspiracy for the

21  same time frame referenced before.  It also alleges a quantity

22  allegation that that was at least a kilogram of heroin that

23  the parties conspired to possess with the intent to distribute

24  or distribute, and that parallels Count 3 in the superseding

25  indictment from July of 2015.

1          Count 3 in the criminal information was previously

2     designated as Count 4 in the superseding indictment.  Count 3

3     relates to an attempt to possess with the intent to distribute

4     5 kilograms or more of cocaine, which occurred between

5     February 4 and February 7 of 2013.  That also alleges a --

6     strike that.

7          Count 3 is an allegation to possess with the intent

8     to distribute and attempt to possess with the intent to

9     distribute a kilogram or more of heroin.  That parallels the

10    previous Count 4, attempt to possess with the intent to

11    distribute a kilogram or more of heroin, for events that

12    occurred between February 4 and February 7 of 2013.

13         Count 4 of the criminal information was previously

14    charged as Count 5 of the superseding indictment, and that

15    references an attempt, between February 13 of 2013 and

16    February 18 of 2013, to possess with the intent to distribute

17    5 kilograms or more of cocaine.  And that is again -- Count 4

18    to criminal information was previously charged as Count 5 of

19    the superseding indictment.

20         Now, the new count, which there were previously two

21    separate violations of Section 18, United States Code, 924(j),

22    charged in relation to correspond with the murders of Theodis

23    Howard and Terrance Morgan, in addition to Count 6 and 9,

24    which I've previously referenced.  So we've taken the two

25    separate 924 violations and alleged them in a single count,

1    again to Mr. Gatling's benefit.

2          And this count alleges that between April 5 of 2010

3    and May 2 of 2013, in the Eastern District of Missouri, the

4    defendant, Dionne Gatling, Dionne Lamont Gatling, aiding and

5    abetting and acting with others known and unknown to the

6    United States, including Andre Alphonso Rush, also known as

7    "Dirty" and "Dre," did knowingly possess one or more firearms

8    in furtherance of the commission of the drug trafficking crime

9    which can be prosecuted in the United States or in a court of

10   the United States.  That's conspiracy to distribute --

11   basically this references the four counts that are currently

12   charged in this criminal information that I've just outlined.

13   That he, acting with others, possessed firearms in furtherance

14   of all those offenses and, in the course of these violations,

15   caused the deaths of Theodis Howard and Terrance Morgan

16   through the use of one or more firearms.

17          Consistent with the previous allegations in the

18   superseding indictment, this alleges a violation of Section 2,

19   924(c)(1)(A) and 924(j).

20          There's also an allegation that, in the course of

21   this violation, the defendant, acting with others, caused the

22   death of a person through the use of a firearm, which is

23   killing as a murder, as defined in Title 18, United States

24   Code, Section 1111, and that the defendant, aiding and

25   abetting and acting with others, including Andre Alphonso

1  Rush, also known as "Dirty" and "Dre," with malice

2  aforethought, unlawfully killed Theodis Howard on or about

3  April 5, 2010, and Terrance Morgan on or about May 2, 2013;

4  and that the defendant, aiding and abetting and acting with

5  others, including Andre Rush, caused the death of each victim

6  with one or more firearms, willfully, deliberately,

7  maliciously, and with premeditation, thereby making this

8  offense punishable under Title 18, United States Code,

9  Sections 2 and 924(j).

10         That's what's alleged in the superseding information,

11 Your Honor.

12 Q    (BY THE COURT) So, Mr. Gatling, you understand the charges

13 now pending against you, sir?

14 A    Yes, sir.

15 Q    Do you understand that because this is a criminal case,

16 you have the right to be represented by an attorney at all

17 stages of the proceedings, and if, for any reason, you're

18 unable to afford an attorney, one is appointed to represent

19 you at the expense of the United States?

20 A    Yes, sir.

21 Q    Have you had enough time to discuss your case with your

22 attorney?

23 A    Yes.

24 Q    Are you satisfied with her representation of you in this

25 case?

1    A    Yes.

2    Q    The next series of questions I'm going to ask you are

3    about the rights you're giving up by pleading guilty.

4           You understand if you plead not guilty, you are

5    entitled to a speedy and public trial by a judge or by a jury?

6    A    Yes.

7    Q    And you understand at a trial you're presumed innocent;

8    the burden of proof is on the United States Attorney to prove

9    you guilty by competent evidence and beyond a reasonable

10   doubt?

11   A    Yes.

12   Q    And you understand that at a trial the United States

13   Attorney would have to bring their witnesses into this

14   courtroom, those witnesses would have to testify in your

15   presence, your attorney could cross-examine those witnesses,

16   object to the evidence, and could call witnesses and offer

17   evidence on your behalf?

18   A    Yes.

19   Q    And at a trial you have the right to testify, and you

20   also have the right not to testify.  Do you understand that?

21   A    Yes.

22   Q    And no one could suggest or argue that you were guilty

23   because you did not testify.  You understand that?

24   A    Yes.

25   Q    You understand that by pleading guilty you're waiving

1   your right to a trial and the other rights associated with a

2   trial?

3   A    Yes, sir.

4   Q    And you understand there's not going to be a trial?

5   A    Yes, sir.

6   Q    But a judgment of guilty will be entered, and sentence

7   will be imposed just as if you were found guilty after a

8   trial.

9   A    Yes, sir.

10  Q    You're also waiving your right against self-incrimination

11  today, because I will ask you if you did what they say you

12  did.  Do you understand that?

13  A    Yes, sir.

14  Q    Having discussed your rights with you, sir, is it still

15  your decision to plead guilty?

16  A    Yes, sir.

17  Q    Has anyone threatened you, forced you, or in any way

18  coerced you into pleading guilty?

19  A    No, sir.

20  Q    There is a plea agreement.  If we turn to the last page,

21  the page marked 31, there are three signatures on this page.

22  The middle signature purports to be your signature.  Is that

23  your signature?

24  A    Yes, sir.

25  Q    Did you read this document before you signed it?

1    A     Yes, sir.

2    Q     Did you go over it with your attorney?

3    A     Yes, sir.

4    Q     Did she answer all your questions?

5    A     Yes, sir.

6    Q     Do you believe you understand what's in this document?

7    A     Yes, sir.

8    Q     Is everything in here true?

9    A     Yes, sir.

10   Q     Okay.  Sentencing won't take place for several months.

11   It will be May before you're sentenced.  What happens between

12   now and then is a presentence report is prepared.  That report

13   will discuss the facts of your case and apply the sentencing

14   guidelines to those facts.  You understand that?

15   A     Yes.

16   Q     And you've talked to your lawyer about the guidelines and

17   how they work; correct?

18   A     Yes, sir.

19   Q     The report will also make a calculation on the sentencing

20   table as to what the recommended sentence is.

21   A     Yes, sir.

22   Q     Do you understand that?  You'll see the report before

23   sentencing; you'll have time to go over it with your attorney;

24   if you disagree with what's in the report, you'll have the

25   right to file objections to the report.  Do you understand

1    that?

2    A    Yes.

3    Q    The U.S. Attorney may object to the report.  Do you

4    understand that?

5    A    Yes.

6    Q    If there are objections, we will have a hearing, I will

7    rule on the objections, and then make a final calculation as

8    to what the recommended sentence is.  Do you understand that?

9    A    Yes, sir.

10   Q    We will also determine if there are any departure

11   motions.  Those are motions under the guidelines that would

12   encourage a sentence that is more than or less than the

13   recommended sentence.  Do you understand that?

14   A    Yes, sir.

15            THE COURT:  Counsel, would you approach sidebar?

16            No white noise?

17   **(PURSUANT TO LOCAL RULE 13.05, A BENCH CONFERENCE WAS HELD ON**

18    **THE RECORD AND PLACED UNDER SEAL, AFTER WHICH THE FOLLOWING**

19              **PROCEEDINGS CONTINUED IN OPEN COURT:)**

20   Q    (BY THE COURT) Finally, sir, there is a statute that lists

21   a number of factors I'm required to consider before I can

22   determine the appropriate sentence in your case.  You

23   understand that?

24   A    Yes, sir.

25   Q    Let's go over your plea agreement.  The plea agreement

18

1   says you've agreed to plead guilty to the five counts of the

2   superseding information.  You understand that?

3   A    Yes, sir.

4   Q    And you understand what's in the plea agreement, these

5   are recommendations to me; I'm not required to follow what's

6   in the plea agreement?

7   A    Yes, sir.

8   Q    I mean, we understand -- and I understand -- there's a

9   joint recommendation that I impose a sentence of 27 years, but

10  I'm not required to follow that agreement.  Do you understand

11  that?

12  A    Yes, sir.

13  Q    But if I sentence you consistent with that agreement,

14  you've agreed not to appeal the sentence that's imposed other

15  than a disagreement you might have about your criminal

16  history.

17  A    Yes, sir.

18  Q    You've also agreed not to file any motions or lawsuits

19  challenging how your case has been handled except for a claim

20  you may have for misconduct by the prosecutor or ineffective

21  assistance by your attorney.

22  A    Yes, sir.

23  Q    You've agreed to give the probation office access to any

24  and all financial information they ask of you.  You understand

25  that?

19

1    A    Yes, sir.

2    Q    If any property was seized from you by law enforcement

3    officials during the course of this investigation, or any of

4    your coconspirators, you've agreed to forfeit, or give up, any

5    ownership interest you might have in that property.  You

6    understand that?

7    A    Yes, sir.

8    Q    Now, beginning on page 22, there is a discussion about

9    how it's proposed the guidelines work in your case.  For the

10   purpose of the guidelines, Counts 1 through 4 are grouped, and

11   the recommended base offense level is a 32.  You understand

12   that?

13   A    Yes, sir.

14   Q    And when we convert the heroin and cocaine so that we can

15   compare them and add them together, we convert them to

16   marijuana, and that conversion results in 3,000 to 10,000

17   kilograms of marijuana, and that's how we determine the 32.

18   You understand that?

19   A    Yes, sir.

20   Q    It's recommended that three levels be added because you

21   were an organizer or leader of five or more persons in a

22   criminal activity.  You understand that?

23   A    Yes, sir.

24   Q    Up to three levels will be subtracted for your acceptance

25   of responsibility in a timely fashion.  Do you understand

20

1   that?

2   A    Yes, sir.

3   Q    As a result, it's recommended for those counts the final

4   total offense level is 32.

5           As to Count 5, the base offense level is a 43.  You

6   understand that?

7   A    Yes, sir.

8   Q    Again, we have a reduction of three levels for an

9   estimated final total offense level of 40.  Do you understand

10  that?

11  A    Yes, sir.

12  Q    And you fully understand that it's your agreement with

13  the United States Attorney to recommend that I impose a

14  sentence of 17 years on Count 5 to run consecutive to any

15  sentence imposed on the first four counts.  Do you understand

16  that?

17  A    Yes, sir.

18  Q    All right.  Now, for you to have been found guilty on

19  Count 1, the United States Attorney would had to have proved

20  beyond a reasonable doubt -- and I should back up.  There is

21  no agreement as to what your criminal history is or how it's

22  to be treated by the guidelines.  Do you understand that?

23  A    Yes, sir.

24  Q    For you to have been found guilty on Count 1, the United

25  States Attorney would had to have proved beyond a reasonable

21

1   doubt that you and others reached an agreement or came to an

2   understanding to distribute a mixture or substance containing

3   cocaine; you voluntarily, knowing, intentionally joined in

4   that agreement either at the beginning or at a later time

5   while it was still ongoing; when you got involved, you knew

6   what the purpose of the agreement or understanding was; and

7   the quantity of cocaine was more than 5 kilograms.

8           Do you understand that?

9   A    Yes.

10  Q    If you don't believe the U.S. Attorney could prove those

11  things beyond a reasonable doubt, you should not plead guilty

12  to Count 1.  Do you understand that?

13  A    Yes, sir.

14  Q    As to Count 2, the United States Attorney would had to

15  have proved beyond a reasonable doubt that you and others

16  reached an agreement or came to an understanding to distribute

17  a mixture or substance containing heroin; you voluntarily and

18  intentionally joined in that agreement or understanding either

19  at the beginning or some later time while it was still in

20  effect; when you got involved, you knew what the purpose of

21  the agreement or understanding was; and the quantity of heroin

22  was more than 1 kilogram.

23          Do you understand that?

24  A    Yes.

25  Q    And if you don't believe the U.S. Attorney could prove

22

1  those things beyond a reasonable doubt, you should not plead

2  guilty to Count 2.  Do you understand that?

3  A    Yes, sir.

4  Q    As to Count 3, the United States Attorney would had to

5  have proved beyond a reasonable doubt that you knowingly and

6  intentionally attempted to possess with the intent to

7  distribute a mixture or substance containing heroin; you did

8  knowingly and intentionally intend to possess heroin with the

9  intention to distribute it to another person or persons; you

10 took substantial steps in furtherance of that effort to

11 possess heroin with the intent to distribute; and that the

12 quantity of heroin involved was more than 1 kilogram.

13          Do you understand that?

14 A    Yes.

15 Q    If you don't believe the U.S. Attorney could prove those

16 things beyond a reasonable doubt as to Count 3, you should not

17 plead guilty to Count 3.  You understand that?

18 A    Yes.

19 Q    As to Count 4, the United States Attorney would had to

20 have proved beyond a reasonable doubt that you and others

21 knowingly and intentionally attempted to possess with the

22 intent to distribute cocaine; that you and others did

23 knowingly and intentionally intend to possess cocaine with the

24 intent to distribute to another person or persons; you took

25 substantial steps in furtherance of that effort to distribute

23

1    cocaine; and there was -- the offense involved more than 5

2    kilograms of cocaine.  You understand that?

3    A    Yes.

4    Q    If you don't believe the U.S. Attorney could prove those

5    things beyond a reasonable doubt, you should not plead guilty

6    to Count 4.

7    A    Yes.

8    Q    As to Count 5, the United States Attorney would had to

9    have proved beyond a reasonable doubt that on or about April 5

10   of 2010, you committed the crime of conspiracy to distribute

11   heroin and cocaine as charged in Counts 1 and 2; aiding and

12   abetting others, acting together, knowingly possessed a

13   firearm in furtherance of those crimes; you, aiding and

14   abetting others and acting together, knowingly discharged a

15   firearm in furtherance of those crimes; and, aiding and

16   abetting others and acting knowingly, used a firearm to cause

17   the death of Theodis Howard.

18          Do you understand that?

19   A    Yes.

20   Q    And on or about May 2 of 2013, you committed the crime of

21   conspiracy to distribute heroin and cocaine as charged in

22   Counts 1 and 2; aiding and abetting others together, knowingly

23   possessed a firearm in furtherance of those crimes; aiding and

24   abetting others and acting together, knowingly discharged a

25   firearm in furtherance of those crimes; and aiding and

24

1  abetting others and acting knowingly, you used the firearm to

2  cause the death of Terrance Morgan.

3         Do you understand that?

4  A    Yes.

5  Q    And if you don't believe the U.S. Attorney could prove

6  those things beyond a reasonable doubt, you should not plead

7  guilty to Count 5.  Do you understand that?

8  A    Yes.

9  Q    Does this agreement contain all the promises made to you

10 by the United States Attorney?

11 A    Yes.

12 Q    Did they make you any promises they didn't put in

13 writing?

14 A    No.

15 Q    Has anyone else offered you anything or given --

16 A    No.

17 Q    -- you anything to get you to plead guilty?

18 A    No, sir.

19 Q    Are you pleading guilty to protect somebody else or cover

20 up for somebody else?

21 A    No, sir.

22 Q    I'm going to ask the Assistant United States Attorney to

23 tell us what facts the U.S. Attorney's Office believes it

24 would have been able to prove had there been a trial, and by

25 prove, I mean prove beyond a reasonable doubt.

1    And, Mr. Gatling, if you would listen carefully,

2    because, when he's done, I'm going to ask you if you did what

3    he says you did.

4    MR. REILLY:  And, Judge, if I may, before I --

5    consistent with our agreement, I would ask to withdraw the

6    previously filed criminal information seeking enhanced

7    punishment under Title 21, United States Code, Section

8    851(a)(1) that imposed a 15-year mandatory minimum as to what

9    would be Counts 1 through 4 in this case, consistent with our

10   agreement.

11   I would ask for leave to withdraw that document.  I

12   filed a written memorandum with the plea paperwork, and that's

13   Document 675, I believe, Your Honor.

14   THE COURT:  I have the written motion, and it will be

15   granted.

16   MR. REILLY:  Thank you.

17   With regard to the evidence in the case, Your Honor,

18   following is a representative sample of the evidence the

19   Government would present if we were to proceed to trial.

20   Beginning at a time prior to or during 2009, and up

21   to and including July 16 of 2015, which is the date of the

22   first superseding indictment, in the Eastern District of

23   Missouri and elsewhere, multiple defendants at various levels

24   within the supply chain conspired to possess with the intent

25   to distribute and to distribute controlled substances

1   containing heroin, cocaine, methamphetamine, marijuana, and

2   other controlled substances within the Eastern District of

3   Missouri.

4        Defendant Dionne Gatling knowingly joined the purpose

5   of -- strike that.  The defendant, Dionne Gatling, knowing the

6   purpose of the agreement and conspiracy, knowingly joined it

7   while it was in effect.  Mr. Gatling was the leader and

8   organizer of the Gatling Drug Trafficking Organization, which

9   consisted of five or more people.

10        The amount of mixture or substance containing a

11   detectable amount of cocaine attributable to and reasonably

12   foreseeable to Defendant Gatling is more than 5 kilograms.

13   The amount of mixture or substance containing a detectable

14   amount of heroin attributable to and reasonably foreseeable to

15   Defendant Gatling is more than 1 kilogram.

16        The defendant conspired with individuals, including

17   Fidel Suarez; Lorenzo "Tall," "Dog," or "Reno" Gibbs; Terrance

18   "Black" Morgan; and "Nephew," who was another drug dealer

19   associated with Terrance "Black" Morgan and the Gatling DTO;

20   Andre, also known as "Dre" and "Dirty," Rush; Tim, also known

21   as "Professor," Rush; and others, to comprise the Gatling DTO.

22        The goal of the DTO was to obtain bulk distribution

23   quantities of controlled substances, including cocaine,

24   heroin, methamphetamine, and marijuana, by purchasing the

25   substances in large quantities to receive bulk discounts.  In

1    turn, the Gatling DTO would then distribute the illegal

2    controlled substances, primarily within the Eastern District

3    of Missouri, at higher prices in order to make a cash profit

4    on the sale of cocaine, heroin, methamphetamine, and marijuana

5    and other -- to other persons for further distribution or

6    consumption.

7           The plea agreement itself outlines some of the

8    different roles that Gibbs, Terrance "Black" Morgan, Andre

9    Rush, and Timothy Rush -- the roles that they played in the

10   agreement.  That included the storage and distribution of

11   narcotics by all those defendants.  But Gatling also in

12   relation to Morgan, Morgan managed a separate distributor

13   named "Nephew."  And I'll touch on that as we go through, but

14   there's a subdistributor, basically, that was managed by

15   Terrance "Black" Morgan.

16          With regard to the specific events of the conspiracy,

17   the evidence would show that Mr. Gatling actively sought and

18   negotiated with sources of supply of illegal narcotics outside

19   the St. Louis area.  During the course of the judicially

20   authorized monitoring calls and other communications from

21   telephones used by Mr. Gatling, investigators learned that

22   Gatling was obtaining methamphetamine, heroin, cocaine, and

23   marijuana from Fidel Suarez.

24          On October 12 of 2012, there's a series of text

25   messages that were intercepted between devices utilized by Mr.

1  Suarez and Mr. Gatling.  In the electronic text messages were

2  coded portions which outlined the negotiation for shipments of

3  multiple pound quantities of methamphetamine from Suarez to

4  Gatling in St. Louis and discussion about the shipment of

5  other types of drugs.

6       Among those, there's discussions, as set out in the

7  plea agreement, at pages 9 and 10.  "Let me know" -- from

8  Suarez to Gatling, "Let me know if you want 2 mess with the

9  shutters."

10      "Hey, bro, need shutters, go cards."  Suarez --

11  that's Gatling's reply.

12      Suarez responds, "Are you sure?  Give me a number.  A

13  number what I am getting.  Are you guys on a roll with it?

14  Cards, you think."  And there's some code but some direct

15  references.

16      Gatling responded, "We can do a lot, but they sell

17  for 13."  It says "1300 ounce."  That's 1,300 per ounce.

18      Suarez responds, "Give me my price whole.  Same size

19  like first.  One turn around time."

20      "Same size like first" -- these are references to

21  their preexisting relationship.

22      At fifth line, 5620, Suarez says, "Need an answer."

23      At 5621, Gatling says, "We will make 20,900.  How

24  much will you give me?"  Gatling says, "Three to four days."

25      Suarez replies, "Need an answer."

29

1          Gatling says, "I'll give you 16,000 pound."

2          Suarez replies, "Sixteen for the Dodgers."

3          The record should reflect that Suarez was a

4    California-, Los Angeles-based source of supply.  "Sixteen for

5    the Dodgers and balance for the Cards."

6          Gatling replies, "Cool.  Let's do it."

7          Suarez replies, "Okay."  And then "Are you sure three

8    days?"

9          Gatling says, "Let's say no longer than five days."

10         Among other things, the intercepts support the

11   conclusion that Gatling and Suarez were discussing pound

12   quantities of methamphetamine and that Gatling agreed to pay

13   $16,000 per pound.  This is an average price -- or was an

14   average price for a pound of methamphetamine in the Midwest in

15   the relevant time frame.

16         There's also allegations to the timing of shipment

17   and payment.  There's further intercepts where the parties

18   discussed "Chinese food."  That is a reference to China white

19   heroin.  Gatling and Suarez communicated about "landscape" --

20   that's a reference to marijuana -- and "mallies."

21         In 2012 the Defendant Gatling and the Gatling DTO

22   received more than 5 kilograms of a mixture or substance

23   containing cocaine from Suarez, more than 1 pound of a mixture

24   or substance containing a detectable amount of methamphetamine

25   from Suarez.

1    There are several intercepts detailed in the plea

2    agreement where Gatling communicates with Terrance Morgan.  He

3    references other coconspirators, including Gibbs, who is

4    referenced as "Tall"; "Professor," who is referenced as -- or

5    Timothy Rush, who is referenced as "Professor".

6    Gatling explains to Morgan that he would tell

7    Gibbs -- that's Gatling would tell Gibbs that Morgan was

8    looking for him.

9    Morgan asked Gatling if he discussed with Gibbs

10   "... as far as us working together on that job site."

11   Gatling said he had talked to him and Morgan and said

12   that "... all I'm trying to do now is just keep working."

13   Gatling said that he had talked to him, and Morgan said that,

14   "... all I'm trying to do now is just keep working on the job

15   site."  A "job site" is a reference to Morgan's continued drug

16   distribution efforts at his residence on Gravois in the city

17   of St. Louis, from which Morgan routinely distributed illegal

18   controlled substances on behalf of the Gatling DTO.

19   In October of 2012, Gatling was intercepted in

20   numerous coded drug-related conversations with Morgan, in

21   which Morgan related various events of the conspiracy to

22   Gatling, including the status of payment by other distributors

23   in the Gatling DTO, such as "Nephew."  Gatling and Morgan

24   routinely referred to illegal narcotics as "paint,"

25   referencing "old paint" and "new paint."

1     They also discussed debts owed by other conspirators,

2  including the "Professor," Tim Rush, and "Dirty," Andre Rush.

3  Morgan routinely distributed methamphetamine for the

4  conspiracy.

5     There are other communications that are relevant

6  where Gatling is advising Gibbs that other conspirators are

7  looking for him.  These are also detailed in the plea

8  agreement.  The intercepts are illustrative of Gatling's role

9  as a leader of this conspiracy and a coordinator.

10     There's surveillance conducted throughout the

11  investigation in addition to the Title III intercepts.  The

12  surveillance included placing Gatling at the residence of

13  Andre Rush in the 3600 block of Phillips in St. Louis City,

14  with other conspirators, including Morgan, Timothy Rush, and

15  Andre Rush.  Gatling later met with Gibbs on one of the

16  specific instances.

17     There were two reverse operations conducted by the

18  Drug Enforcement Administration in this case.  On February 7,

19  Gatling attempted to acquire 2 kilograms of heroin from a

20  purported cartel source of supply in Memphis, Tennessee.

21     On February 8 of 2013, Gatling attempted to acquire

22  15 kilograms of cocaine from the same purported source of

23  supply, this time with the delivery to occur in south St.

24  Louis County.

25     The defendants at the time were unaware that Gatling

1    had arranged for the deliveries with an undercover law

2    enforcement officer.  Gatling believed he was negotiating the

3    deliveries with a cartel-affiliated source of supply.

4           As detailed in the plea agreement on page 13, Gatling

5    met with an undercover investigator on February 4 of 2013 in

6    Atlanta, Georgia, to arrange for the delivery of 2 kilograms

7    of heroin for the Gatling Drug Trafficking Organization.  The

8    heroin was, of course, bound for the Eastern District of

9    Missouri.

10          During the initial recorded meeting, Gatling made a

11    number of statements that are detailed in the plea agreement

12    that indicate his knowledge and intent and prowess as a drug

13    dealer.  He asked the investigator "Do you do tar or white?"

14    which was a reference to brown heroin or white heroin.

15          The UC said he could provide brown.

16          And Gatling stated, "That's perfect."

17          Gatling explained that he could do two to three

18    bricks a week if the quality was good, referencing the

19    quantity of heroin, each brick being a kilo, of course.

20          Gatling explained that "I ... we specialize in

21    cocaine."  "We used to doing hundreds, man," were among his

22    quotes.

23          He also stated, "I can move a lot of the H."  "H" was

24    a reference to the heroin.

25          Defendant Gatling explained that "I'ma do a whole H a

1    day if it's good."  That's a reference to distributing an

2    entire kilogram in a day.

3          Gatling stated words to the effect that he had buyers

4    with "money to buy five hundred" -- that's a reference to

5    buyers who could buy 500 grams, or a half a kilo of heroin --

6    and "two hundred fifty," which is 250 grams.

7          Gatling, toward the end of the meeting, explained,

8    "This has been a beautiful trip.  This is what I've been

9    looking for, man."

10         On February 7, agents conducted a reverse operation

11   in which Gatling enlisted Tim Rush and Lorenzo Gibbs to meet a

12   purported cartel source in Memphis, in the Memphis area, to

13   exchange Gatling's Toyota Camry for a Cadillac Escalade

14   equipped with a hidden compartment containing the 2 --

15   purported 2 kilograms of heroin.  The terms were that the

16   heroin would be provided, or fronted, at a price of $55,000

17   per kilogram to Gatling, with Gatling providing the Camry as

18   collateral.

19         Timothy Rush and Lorenzo Gibbs made the trip to

20   Memphis on November 7.  They met with the undercover.  Both

21   Timothy Rush and Gibbs declined instructions on how to open

22   the compartment and stated they would get the instructions on

23   how to open the trap when they returned to St. Louis.

24         During the evening hours of February 7, 2013,

25   Missouri Highway Patrol investigators stopped Timothy Rush on

34

1    Interstate 55 just south of Sikeston.  Timothy Rush put the

2    phone on speaker, on the speaker function.  This was

3    ostensibly to notify Dionne Gatling.  It's indicative of the

4    experience level of the conspirators.

5           Defendant Gatling later that evening contacted the

6    undercover and stated words to the effect that he hoped --

7    "he" meaning Gatling -- hoped the compartment was tight.

8    Gatling also stated that Timothy Rush was a solid, long-time

9    guy.

10          On February 18 of 2013, there was a second

11   transaction that culminated on February 18.  This time the

12   purported negotiation was for 15 kilograms of cocaine.  During

13   the course of the communications as detailed on page 15 of the

14   plea agreement, Gatling reassured the undercover, by stating,

15   "I'll tell you what.  If you get this mother F, man, you'll be

16   happy.  You know what I mean.  If you get this mother F, man,

17   you can get it in here.  I can make that up, brother.  I can

18   make that up.  First time you in here, I can make that up.

19   You just send your guy down here, I'll put them up.  He can

20   just sit and wait, man, you know."

21          And here, of course, Gatling was referencing his

22   ability to move a load of narcotics quickly.

23          Gatling, on February 14 of 2013, stated to the

24   undercover "I need that other thang, brother.  I need it bad.

25   Y'all got to get it in here one time, brother."

1    The second deal was for 15 kilograms of cocaine, but

2    Gatling, prior to the deal, also stated, "I was trying to get

3    back on the H page."  That's heroin.

4    When the UC inquired regarding quantity, he said,

5    "I'm asking how many you going to need."

6    Gatling replied, "Shit, bro, all you can give me."

7    The "other thang" that was previously referenced and

8    the "H page" was a reference to heroin.

9    On February 18 of 2013, the investigators conducted

10   the reverse operation, which is detailed on pages 15 and 16,

11   in which the undercover had a purported commercial truck

12   driver who was going to deliver the load.  Timothy Rush had

13   contact with the undercover, and they arranged for a meeting

14   at the Hampton Inn in the vicinity of Butler Hill Road on

15   Interstate 55 -- at Interstate 55.

16   The task force officer arrived at the Hampton Inn.

17   He also observed Lorenzo Gibbs operating a white Chevrolet

18   Impala, who appeared to be conducting a canvass of the area,

19   before Gibbs parked at a gas station in an area where he could

20   overlook the parking lot of the Hampton Inn.

21   Rush arrived and met the task force officer who he

22   thought was a drug dealer.  Rush was in the process of

23   approaching the task force officer to take the possession of

24   the large duffel bag as he was taken into custody.

25   Investigators contacted and detained Gibbs.

36

1    The investigators were also on a judicially

2  authorized wiretap at the time in which they monitored

3  conversations.  Later that evening, between Andre Rush and the

4  Defendant Gatling, Andre Rush coordinated a meeting.  He

5  coordinated communication to Gatling with the events that

6  happened regarding the detention of Timothy Rush and Gibbs.

7    And as set forth in the plea agreement at page 16 and

8  17, agents conducted surveillance at a Starbucks in the

9  vicinity of Grand Avenue and Highway 40, at which time they

10  observed Gatling arrive in an SUV-type vehicle.  Gibbs arrived

11  in the same white Impala that he had during the reverse

12  operation.  Gibbs and Gatling exited their vehicles and walked

13  back to the back of the building and had a brief meeting.

14  They quickly returned to their vehicles, and Gatling drove

15  off.  The investigators terminated the surveillance so as not

16  to jeopardize the investigation.

17    The parties have an agreement as to the relevant

18  conduct in this case that the conspiracy -- the amount of

19  controlled substance in the conspiracy attributable to the

20  defendant as a result of his conduct, and the conduct of

21  others reasonably foreseeable, is not more than 3,000

22  kilograms but less than 10,000 kilograms of marijuana based

23  upon the conversion of the quantities of cocaine, heroin,

24  methamphetamine, and marijuana attributable to the defendant.

25    I'm going to transition and talk about murders.

1  Gatling organized the murder of Theodis Howard.  This is

2  detailed at page 18 of the plea agreement.

3          The murder occurred on April 5, 2010.  This murder

4  was retaliation for Howard's previous cooperation in a federal

5  narcotics investigation against Deron "Juannie" Gatling, who

6  was Mr. Gatling's brother.  Gatling recruited the participants

7  and drove the shooters to and from the scene of the murder.

8  Gatling remained in his Volkswagen during the murder.

9          The defendant Andre Rush positioned him in a manner

10  to observe Mr. Howard approach the Grace Hill Medical Center

11  in St. Louis City.  Upon observing Howard, Andre Rush

12  knowingly identified Howard so that Derrick "Bub" Clemons and

13  Raymond "Rambo" Jones could shoot Howard to death with

14  firearms.

15          Derrick "Bub" Clemons shot Howard, causing him to

16  fall to the ground.  Jones then shot Howard while he was on

17  the ground.  After shooting Howard, Derrick "Bub" Clemons,

18  Jones, and Andre Rush ran to Gatling's Volkswagen, where

19  Gatling was waiting for them.

20          Officers responded to the -- officers of the St.

21  Louis Metropolitan Police Department responded to this

22  facility on April 5, 2010, at approximately 3:57 PM.  This

23  building is located at 2524 Hadley in St. Louis City, in the

24  Eastern District of Missouri.

25          Theodis Howard was lying on the ground or the

1    sidewalk in front of a facility.  He sustained several gunshot

2    wounds and was pronounced dead at the scene.  Investigators

3    recovered six .45 caliber shell casings and six 9 mm casings,

4    consistent with the use of two firearms.  The cause of death

5    was gunshot wounds.  The manner of death was homicide.

6            Prior to his murder, Victim Howard made detailed and

7    voluminous statements against many of his conspirators,

8    including statements implicating Deron Gatling.

9            On February 21, 2006, Howard was sentenced to a term

10   of 72 months' imprisonment after the judge granted the

11   Government's motion for a downward departure based on Howard's

12   cooperation.  The plea was entered in Cause No. 4:04-517-CAS.

13           In the same case, on April 27, 2006, Deron Gatling

14   was sentenced to 210 months of imprisonment for his

15   involvement in the conspiracy to distribute narcotics.

16           In 2010, the victim Theodis Howard was released from

17   custody and was serving the remainder of his sentence at the

18   St. Louis Community Release Center at Dismas House when he was

19   murdered.

20           With regard to the murder of Terrance Morgan.  On May

21   2, 2013, Gatling directed and encouraged Andre Rush to shoot

22   and kill Terrance Morgan.  This was to prevent Morgan, a

23   member of the Gatling DTO, from cooperating with federal

24   authorities in the pending investigation.  Gatling drove

25   Morgan and Andre Rush to the location of the murder,

39

1    instructed Andre Rush to kill Morgan, and drove Andre Rush

2    from the scene of the murder.  This murder was to further the

3    activities of the drug trafficking conspiracy.

4            Shortly before the murder, Gatling learned that he

5    was under investigation by the DEA after his attorney, his

6    then attorney, not Ms. Trog, met with agents of the DEA.  The

7    DEA agents provided some information relative to the

8    investigation described herein to the attorney who represented

9    Gatling at the time.  Based on his lawyer's communications

10   with the DEA, Gatling believed he would be facing drug

11   trafficking charges.  Gatling was concerned that Morgan might

12   cooperate with law enforcement.

13           The day of the murder, Morgan was dropped off at

14   Andre Rush's residence.  Morgan told Andre Rush that the DEA

15   had contacted him and they were asking about Cuff, which is a

16   reference to Mr. Gatling here.  Andre Morgan -- strike that.

17   Andre Rush and Morgan went to a nearby park where they met

18   Gatling and Tim Rush.  Morgan told Gatling about the DEA

19   contacting him, and Gatling and Morgan had a private

20   conversation.

21           Gatling told Andre Rush they were going for a ride

22   and invited Morgan to go with them.  Prior to going for a

23   ride, Gatling asked Defendant Andre Rush if he had his "buddy"

24   -- that's a reference to a firearm -- with him.  Andre Rush

25   then retrieved the firearm, a revolver, from a nearby

1   location.  Gatling drove with Morgan in the front seat and

2   Andre Rush in the back seat.  The parties stopped, eventually,

3   to allow Mr. Morgan to urinate.  Gatling turned to Andre Rush

4   and stated words to the effect of "go get him out of the way."

5          Andre Rush exited his vehicle, entered an alley,

6   walked behind Terrance Morgan, shot him in the back of the

7   head.  Terrance Morgan fell to the ground, and Andre Rush shot

8   him a couple more times in the head area.  Andre Rush returned

9   to the front passenger seat.  Gatling drove off.  Andre Rush

10  later discarded the firearm.  Andre Rush -- strike that.

11  Gatling agreed to pay Andre Rush but did not pay him.

12         Consistent with the events described herein, on May 2

13  of 2013 agents responded to the alley in the rear of 2504

14  California, where they discovered Terrance Morgan lying on the

15  ground in the alley between 2504 California and 2503 Ohio.

16  Morgan was pronounced dead.  The cause of death was gunshot

17  wounds.  The manner of death was homicide.

18         That would be the evidence, Your Honor.

19  Q   (BY THE COURT) So, Mr. Gatling, is what the Assistant U.S.

20  Attorney said true?

21  A    Yes, sir.

22  Q    You understand that as to Counts 1, 2, 3, and 4, the term

23  of imprisonment to which you're -- the counts you're pleading

24  guilty is not less than ten years and not more than the rest

25  of your life?

1    A    Yes, sir.

2    Q    And as to Count 5, the potential penalty of imprisonment

3    is also not less than ten years and not more than the rest of

4    your life.  You understand that?

5    A    Yeah.  Yes, sir.

6    Q    And the maximum fine on Counts 1 through 4 is

7    $10 million, and as to Count 5 it's $250,000.  Do you

8    understand that?

9    A    Yes, sir.

10   Q    You could be sentenced to the maximum term of

11   imprisonment on each count, assessed the maximum fine on each

12   count, or all of them added together.  You understand that?

13   A    Yes, sir.

14   Q    And that in addition to any term of imprisonment that may

15   be imposed, a period of supervised release of not less than

16   five years and not more than the rest of your life will also

17   be imposed.  Do you understand that?

18   A    Yes, sir.

19   Q    You understand what supervised release is, is after

20   you're released from custody, you will be released subject to

21   certain conditions and remain under the jurisdiction of the

22   court.  And if you violate the conditions of your release, you

23   could be returned to custody, the length of your supervised

24   release could be extended, or other terms and conditions could

25   be placed on your release?

42

```
 1   A     Yes, sir.

 2              THE COURT:  Is there any restitution?

 3              MR. REILLY:  No, Judge.

 4   Q   (BY THE COURT) You will also be required to pay a special

 5   assessment in the amount of $100 per count, which is due at

 6   the time of sentencing.  Do you understand that?

 7   A     Yes, sir.

 8   Q     Do you understand that by pleading guilty you are

 9   subjecting yourself to the maximum penalties we just

10   discussed?

11   A     Yes, sir.

12   Q     As you know, at the time of sentencing, your attorney and

13   the United States Attorney will be making recommendations to

14   me about what your sentence should be, but you understand I'm

15   not required to follow their recommendation?

16   A     Yes.

17   Q     If the sentence is more severe than the attorneys

18   recommend or more severe than you had hoped for, that is not a

19   reason for you to seek to withdraw your guilty plea.  Do you

20   understand that?  And do you understand that by pleading

21   guilty you may lose the right to vote, the right to hold

22   public office, the right to serve on a jury, and the right to

23   possess a firearm?

24   A     Yes.

25   Q     You understand in the federal system parole has been
```

1    abolished, and if you're sentenced to prison, you will not be

2    released on parole?

3    A    Yes.

4    Q    So, Mr. Gatling, do you believe you understand the

5    possible consequences of pleading guilty today, sir?

6    A    Yes, sir.

7    Q    After all the things we've talked about, is it still your

8    decision to plead guilty?

9    A    Yes, sir.

10            THE COURT:  Does the attorney for the United States

11   Attorney's Office or the attorney for Mr. Gatling know of any

12   reason why I should not accept his guilty pleas?

13            MR. REILLY:  No, Judge.

14            MS. TROG:  No, Your Honor.

15            THE COURT:  How do you plead to Count 1, sir?

16            THE DEFENDANT:  Guilty.

17            THE COURT:  How do you plead to Count 2?

18            THE DEFENDANT:  Guilty.

19            THE COURT:  How do you plead to Count 3?

20            THE DEFENDANT:  Guilty.

21            THE COURT:  How do you plead to Count 4?

22            THE DEFENDANT:  Guilty.

23            THE COURT:  How do you plead to Count 5?

24            THE DEFENDANT:  Guilty.

25            THE COURT:  Based on Dionne Gatling's statements

1  under oath in response to my questions, I find that he is

2  competent to enter pleas of guilty to the offenses charged in

3  Counts 1 through 5 of the superseding information, his pleas

4  are made knowledgeably and voluntarily, and have a basis in

5  fact that contains all the elements of the offenses charged.

6  Therefore, I will accept his pleas and will enter judgment

7  upon those pleas.

8           Sentencing is set for Friday, May 17, at 11 AM.  Any

9  other matters for the Court's consideration today?

10          MR. REILLY:  No, Judge.

11          MS. TROG:  No, Your Honor.

12          THE COURT:  Very good.  We'll see you then.

13              **(PROCEEDINGS CONCLUDED AT 11:15 AM.)**

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 45 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 27th day of June, 2019.


/s/Shannon L White
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter